**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Daniel S. Guerra (SBN 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com

Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 – 1989
Big Bear Lake, CA 92315
Office : (562) 612-1708
Email : rc@rosscornelllaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JOSEPH ABDULLAH on behalf of himself and all similarly situated persons,

Plaintiff,

v.

ALIEXPRESS E-COMMERCE ONE PTE., LTD.,

Defendant.

Case No: 3:25-cv-05206-CRB

**SECOND AMENDED COMPLAINT**

1. Cal. Penal Code § 638.51
2. Cal. Civil Code § 1798.100*, et seq.*
3. Cal. Bus. & Prof. Code § 17200, *et seq.*

**<u>CLASS ACTION</u>**

## I. NATURE OF THE ACTION

1. Defendant ALIEXPRESS E-COMMERCE ONE PTD., LTD. (referred to herein as "Defendant" or "ALIEXPRESS") owns and operates a website, www.aliexpress.us (the "Website").

2. This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3. Plaintiff JOSEPH ABDULLAH files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Ads/DoubleClick Tracker
- Facebook PixelTracker
- Bing/Microsoft Ads Tracker
- The Trade Desk Tracker
- Pinterest Tracker
- Rubicon Tracker

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond

Defendant's direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8. The Trackers are operated by distinct third parties: Google LLC (Google Ads / DoubleClick Tracker); Meta Platforms, Inc. (Facebook Pixel Tracker); Microsoft Corporation (Bing / Microsoft Ads Tracker); The Trade Desk, Inc. (The Trade Desk Tracker); Pinterest, Inc. (Pinterest Tracker); and Magnite, Inc. (Rubicon Tracker). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9. Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

13. Defendant provides a "Privacy Policy" on the Website (the "Privacy Policy") but does not conform to the Privacy Policy:

a. Defendant does not clearly disclose that real-time behavioral data is transmitted to third parties immediately upon site arrival;

b. Defendant represents that sensitive personal information is not used for inferring characteristics; however, search terms, page activity, and inferred interests are transmitted to platforms that use such data for profile building;

c. Tracking and third-party sharing occurs prior to presenting users with a valid choice to opt-out or manage consent;

d. Defendant claims data collection is limited to what is necessary to provide services or with consent; however, extensive behavioral data is collected on purely informational pages; and

e. Defendant omits material details regarding the depth of personal data shared with third parties and the nature of behavioral profiling activities.

14. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

16. Plaintiff JOSEPH ABDULLAH ("Plaintiff") is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter including but not limited to May 28, 2025, and during which time Plaintiff submitted private information on the Website in order to complete a purchase from ALIEXPRESS with his credit card. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant ALIEXPRESS E-COMMERCE ONE PTD., LTD. is a Private Limited Company that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

18. ALIEXPRESS is a multinational technology company specializing in e-commerce, retail, internet, and technology services. Through its various platforms including the Website,

ALIEXPRESS operates one of the world's largest online marketplaces, connecting millions of buyers and sellers across the globe. The company maintains a significant commercial footprint in the United States and facilitates cross-border trade, digital storefronts, and product discovery for a wide range of goods and services.

19. The Website functions as a core consumer-facing platform within ALIEXPRESS's broader commercial ecosystem. While ALIEXPRESS supports a range of merchant services and digital infrastructure, the Website is directly responsible for facilitating retail transactions, processing customer payments, and managing communications between buyers and sellers. In the course of operating the Website, ALIEXPRESS collects and processes significant volumes of user data for purposes that include transaction fulfillment, behavioral profiling, and digital advertising all of which give rise to obligations under California and federal privacy law.

20. The Website serves as ALIEXPRESS's primary digital storefront. It allows users to explore product listings, save favorites, manage accounts, and complete purchases. In addition to these retail functions, the Website also operates as a behavioral tracking and advertising platform. Through the deployment of third-party tracking technologies, including advertising pixels, event tracking scripts, and behavioral monitoring tools, ALIEXPRESS collects granular data about user interactions with the site. These data practices form a core component of ALIEXPRESS's performance marketing and ad-targeting strategy, and raise serious legal concerns under the California Invasion of Privacy Act (CIPA) and other consumer privacy statutes.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

22. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Northern District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is

directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

23. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

24. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

25. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

26. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

27. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

28. In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

29. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

30. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

31. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

32. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

33. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

34. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (See *Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

35. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

36. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. ***Figure 1*** below illustrates sample HTTP requests.

***Figure 1***




37. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

38. The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used via external geolocation services to infer a user's general location, including state, city, and in some cases, ZIP code.

40. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

41. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

42. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting particularly when combined with other tracking identifiers and third-party enrichment.

43. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

44. As "routing, addressing, or signaling information," a public IP address is

indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

45. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

**3. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

46. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

47. This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

48. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint, especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

49. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as

identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

50. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

51. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

52. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4. *Plaintiff's And Class Members' Data Has Financial Value***

53. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

54. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

55. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

56. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

57. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

---

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

58. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

59. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

60. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

62. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

63. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

64. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6. *The Trackers Function Together to Achieve Targeted Objectives***

65. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

66. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem, and these entities leverage shared identifiers, cookie syncing, and cross-

device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

67. On the Website, a coordinated network of third-party trackers is deployed to facilitate identity resolution, targeted advertising, and data monetization. This infrastructure includes both trackers embedded directly in the page's HTML and others dynamically injected through JavaScript execution during the homepage session. Google Ads / DoubleClick, Facebook Pixel, Bing / Microsoft Ads, and Pinterest are embedded via script tags that load directly from their respective domains. Additional trackers including The Trade Desk and Rubicon are dynamically injected and are active on the homepage. These technologies operate in tandem to collect and transmit user interaction data in real time, supporting downstream advertising, profiling, and data-sharing operations.

68. Identity resolution on the Website is primarily facilitated through the Facebook Pixel Tracker and Bing / Microsoft Ads. The Facebook Pixel Tracker identifies users by linking on-site behavior to existing Facebook cookies and logged-in sessions, enabling the correlation of browsing activity with social media identities. Bing / Microsoft Ads contributes to identity resolution by capturing conversion and session-level signals associated with Microsoft-linked user accounts and identifiers. These combined technologies enable ALIEXPRESS to de-anonymize users over time, correlate behaviors with known identities, and build detailed demographic and behavioral profiles.

69. Once identity signals are gathered, targeted advertising and data monetization are executed through platforms such as Google Ads / DoubleClick, The Trade Desk, Rubicon, and Bing / Microsoft Ads. These entities participate in real-time bidding (RTB) and programmatic advertising markets, enabling ALIEXPRESS to auction access to users based on behavioral and identity-linked data. Google Ads / DoubleClick delivers performance-based advertising by leveraging browsing behavior, conversion history, and demographic profiles to serve targeted creatives. The Trade Desk acts as a demand-side platform (DSP), facilitating cross-channel ad buying and real-time audience targeting. Rubicon functions as a supply-side platform (SSP), managing ALIEXPRESS's advertising inventory while syncing user identifiers with bidding partners. Bing / Microsoft Ads uses conversion tracking and event-level data to enable remarketing and audience segmentation across Microsoft's

advertising ecosystem. Together, these trackers convert user interactions into marketable audience segments, driving measurable advertising outcomes and monetization for ALIEXPRESS.

70. Defendant shares User Information with third-party advertising platforms, including Criteo, Adnxs (AppNexus), and Teads. These companies operate in real-time bidding environments that sell advertising space to the highest bidder using behavioral data collected during a user's session on the Website. As soon as a user loads the Website, data is transmitted to these platforms without any action or consent from the user. This includes the user's internet protocol address, browser and device identifiers, language settings, and the specific page context being visited. This information enables advertising platforms to identify the user and serve targeted ads in real time.

71. The Defendant's interactions with multiple header bidding exchanges, including Criteo and Teads, indicates that Defendant participates in an advertising system that allows real-time competition for ad inventory. This system increases Defendant's advertising revenue by allowing multiple bidders to compete simultaneously for each impression. Defendant collects and transmits user data to these advertising exchanges, which then deliver the winning advertisement. These exchanges provide no utility for the user; they exist solely to support Defendant's advertising model. By monetizing user attention and behavior through third-party data transfers, Defendant treats personal information as a revenue-generating commodity.

## V. <u>SPECIFIC ALLEGATIONS</u>

### *1. Google Ads / DoubleClick Tracker*

72. The Google Ads / DoubleClick Tracker is a digital advertising and behavioral tracking technology operated by Google LLC. It is designed to deliver display advertisements, measure engagement, and support real-time bidding on programmatic ad exchanges. The Google Ads / DoubleClick Tracker enables Google and its advertising clients to collect detailed user interaction data and optimize ad delivery across a vast network of third-party websites.

73. When implemented on the Website, the Google Ads / DoubleClick Tracker collects a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and in-page interaction data such as clicks or hover events. It also captures technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data

points are linked to persistent browser identifiers, often placed via cookies or pixel fires, that allow Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles.

74. The Google Ads / DoubleClick Tracker is designed to monitor user engagement signals on the Website, including page views, link clicks, and other browser-level interactions. These interaction signals are transmitted to Google's ad infrastructure to facilitate targeted advertising, audience retargeting, and conversion tracking. The DoubleClick Tracker executes via JavaScript calls to domains including pagead2.googlesyndication.com and googleads.g.doubleclick.net, and it activates automatically upon page load without requiring any action by the user.

75. ***Figure 2*** below is a screenshot from the Website, confirming that a Google tracking script was triggered automatically upon visiting the homepage. A GET request to www.googletagmanager.com was initiated during the initial session and returned a 200 OK status. This script loads Google Tag Manager, which serves as a container for additional Google tracking infrastructure, including Google Ads / DoubleClick. The presence and early activation of this script demonstrate that Google's advertising technologies were loaded at the outset of the user's session, prior to any user interaction.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 2***




76. ***Figure 3*** below is a screenshot of network activity on the Website, capturing DNS queries and corresponding responses for subdomains of doubleclick.net, including cm.g.doubleclick.net, as well as for www.googletagmanager.com. These DNS transactions confirm that the Website initiated background connections to Google's advertising infrastructure during the user's initial session. This activity occurred prior to any user interaction, verifying that the Google Ads / DoubleClick Tracker was silently activated upon page load.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

*Figure 3*




77. Defendant surreptitiously installed, executed, embedded or injected the Google Ads / DoubleClick Tracker onto users' browsers by embedding tracking scripts into the Website's source code. When a user visits the Website, their browser automatically executes this code, which initiates outbound network requests to Google's advertising servers and transmits metadata including page URL, referrer information, browser details, and session identifiers as part of a third-party ad targeting and profiling system.

78. The Google Ads / DoubleClick Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

79. The Google Ads / DoubleClick Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

80. The Google Ads / DoubleClick Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures outgoing signaling data such as URLs visited, click paths, timestamps, and referrer headers and also processes incoming

metadata such as ad impressions and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader advertising profiles.

81. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Ads / DoubleClick Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

82. Consequently, the Google Ads / DoubleClick Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***2. The Facebook Pixel Tracker***

83. The Facebook Pixel Tracker is a behavioral tracking script implemented through Meta's Pixel technology, typically delivered via domains such as connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Pixel Tracker is dynamically injected through Google Tag Manager and is loaded during the initial homepage session. Once executed, the script initiates background communication with Meta's servers and enables real-time tracking of user activity without requiring any user interaction.

84. Once the user loads a page, the Facebook Pixel Tracker executes automatically, capturing interaction data such as page views, button clicks, form interactions, and scroll behavior. These signals are sent to Meta's servers and associated with the user's Facebook or Instagram profile even if the user never directly interacts with any Meta service while on the Website.

85. The data collected by the Facebook Pixel Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Facebook Pixel Tracker can tie Website behavior to the user's unique Meta ID. Even if not logged in, Meta can assign a persistent identifier using cookies, browser fingerprinting, or pixel fire data. This enables the creation of robust cross-site behavioral profiles based on a user's activity on the Website.

86. The Facebook Pixel Tracker also serves ALIEXPRESS's goal of targeted advertising by enabling the creation of "Custom Audiences," groups of users who have taken specific actions on

the Website, such as browsing listings, viewing product pages, or beginning a checkout process. ALIEXPRESS can then use Meta's Ads Manager to re-target those users across Facebook and Instagram, or to generate "Lookalike Audiences" that mirror the behavioral patterns of existing visitors. These mechanisms allow ALIEXPRESS to efficiently deliver marketing content to users most likely to engage or convert.

87. The Facebook Pixel Tracker contributes to ALIEXPRESS's data monetization strategy by turning behavioral insights into measurable advertising ROI. Meta provides ALIEXPRESS with real-time analytics regarding user behavior, campaign performance, and conversion attribution. The Facebook Pixel Tracker enables a closed-loop feedback system that connects on-site engagement with off-site ad delivery, allowing ALIEXPRESS to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Facebook Pixel Tracker functions as a core part of ALIEXPRESS's commercial surveillance infrastructure.

88. ***Figure 4*** below is a screenshot from the Website, confirming that the Facebook Pixel Tracker was triggered during the user's session on the homepage. JavaScript code referencing fbevents.js executed automatically, initiating multiple requests to Meta's tracking infrastructure hosted on facebook.com. These requests returned 200 OK status codes and were triggered within seconds of page load, confirming that the Facebook Pixel Tracker was active and collecting behavioral data without any user interaction.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 4***




89. ***Figure 5*** below is a screenshot of network activity on the Website, capturing DNS queries and corresponding responses for connect.facebook.net and www.facebook.com. These transactions confirm that the Website initiated background communication with Meta's tracking infrastructure during the homepage session. The DNS activity was automatically generated and occurred without any user interaction, verifying that the Facebook Pixel Tracker was silently active in the background.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 5***




90. ***Figure 6*** below is a screenshot of the user's browser cookie storage, showing that the Facebook Pixel Tracker set a persistent cookie (_fbp) associated with Meta's tracking infrastructure. This identifier was created automatically during the initial homepage session, without any user interaction, and is used to track user behavior over time. The presence of this cookie confirms that the Facebook Pixel Tracker established a long-lived browser identifier for behavioral profiling and ad targeting.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

*Figure 6*




91. Defendant surreptitiously installed, executed, embedded, or injected the Facebook Pixel Tracker onto users' browsers by dynamically injecting Meta's JavaScript pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata—including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

92. The Facebook Pixel Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

93. The Facebook Pixel Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

94. The Facebook Pixel Tracker captures and transmits routing, addressing, and signaling information such as the user's page URL, referrer, and browser metadata to Meta's servers as soon as the page loads, often without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the

user, but rather by code embedded in the website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

95. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Pixel Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

96. Consequently, the Facebook Pixel Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***3. The Bing / Microsoft Ads Tracker***

97. The Bing / Microsoft Ads Tracker, typically delivered through the domain bat.bing.com, is part of the Microsoft Advertising platform (formerly Bing Ads). It is used to track user interactions on websites in order to attribute conversions, retarget visitors, and optimize advertising campaigns across Microsoft's search and display networks, including Bing, MSN, and LinkedIn.

98. The Bing / Microsoft Ads Tracker is designed to silently collect a range of user data when a visitor lands on the Website. It gathers device and browser metadata, IP address, estimated geolocation, referrer URLs, and viewed pages. It is also designed to capture click events and conversion actions such as form submissions or account sign-ups on the Website. Through the use of cookies and unique identifiers, the Bing / Microsoft Ads Tracker can track users across sessions and websites to build behavioral profiles and deliver targeted advertising.

99. ***Figure 7*** below is a screenshot from the Website, confirming that the Bing / Microsoft Ads Tracker was triggered during the user's session on the homepage. A JavaScript request to bat.bing.com returned a 200 OK status and was initiated by Google Tag Manager (gtm.js). Additional subrequests, including ping and gif calls, originated from the Bing tracking script (bat.js). This confirms that Microsoft's tracking infrastructure was activated automatically, without any user interaction.

***Figure 7***




100. ***Figure 8*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for the Microsoft tracking domain c.bing.com. This DNS transaction occurred during the homepage session and was automatically initiated by the browser in response to Microsoft's tracking script. The activity confirms that the Bing / Microsoft Ads Tracker was silently resolved and activated without any user interaction.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 8***




101. Defendant surreptitiously installed, executed, embedded, or injected the Bing / Microsoft Ads Tracker onto users' browsers by copying Microsoft's JavaScript tracking code snippet and adding it to the Website. When a user visits the Website, their browser executes this code, which triggers outbound requests to Microsoft's servers and transmits metadata including the user's IP address, page URL, referrer, and session-specific identifiers. This occurs silently in the background, without any user interaction or awareness, enabling Microsoft to monitor user activity and collect behavioral data from each session.

102. The Bing / Microsoft Ads Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

103. The Bing / Microsoft Ads Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

104. The Bing / Microsoft Ads Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers - all of which constitute as routing or signaling information under CIPA.

105. The Bing / Microsoft Ads Tracker collects real-time signaling and routing information from the user's device without direct interaction. It acts as a pen register by capturing outbound metadata such as page visits, click events, and form submissions, and as a trap and trace device by receiving inbound responses like ad content and tracking pixels. These communications occur passively, enabling Microsoft to assign user identifiers, build behavior profiles, and facilitate personalized advertising.

106. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Bing / Microsoft Ads Tracker on Plaintiff's and Class Members' browser or to collect or share data with Microsoft.

107. Consequently, the Bing / Microsoft Ads Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***4. The Trade Desk Tracker***

108. The Trade Desk Tracker—typically delivered via the domain adsrvr.org—is a third-party behavioral tracking pixel operated by The Trade Desk, Inc. On the Website, this tracker is dynamically injected into users' browsers upon visiting the site. The tracker initiates a connection to The Trade Desk's servers and captures a range of data points including IP address, device type, browser version, geolocation, and unique cookie or device identifiers. These transmissions occur silently and without user interaction, confirming that user activity is being monitored in real time for purposes of behavioral profiling, identity resolution, and targeted advertising.

109. Once activated, the Trade Desk Tracker plays a central role in identity resolution by assigning users a persistent identifier that can be recognized across other websites, apps, and devices. This is accomplished through techniques such as cookie syncing and probabilistic matching, tools that allow The Trade Desk to correlate behavioral data collected on the Website with broader user profiles across the internet. These mechanisms enable The Trade Desk to build a cohesive view of an individual's online behavior even when they are not logged in.

110. The Trade Desk Tracker facilitates targeted advertising by enabling ALIEXPRESS to reach users who previously visited the Website, interacted with specific content, or initiated

transactions. This includes retargeting individuals with personalized ads served across a broad advertising ecosystem spanning thousands of partner websites and ad exchanges. The Trade Desk's data enrichment tools allow ALIEXPRESS to identify behavioral traits among its site visitors and assemble lookalike audiences composed of users who exhibit similar interests or attributes. These capabilities significantly expand ALIEXPRESS's ability to re-engage high-value users and acquire new customers aligned with its marketing objectives.

111. The Trade Desk Tracker supports ALIEXPRESS's broader objective of data monetization by transforming real-time behavioral signals into actionable, revenue-generating insights. By tracking users across multiple touchpoints and matching them to advertising segments, ALIEXPRESS gains access to detailed performance analytics and the ability to optimize ad spend. The data collected feeds into a programmatic ad-buying ecosystem where advertisers compete to show personalized ads to high-value users often based on the very behavioral traits observed on the Website. In this way, The Trade Desk enables ALIEXPRESS to extract commercial value from user activity, while facilitating profiling and ad delivery practices.

112. ***Figure 9*** below is a screenshot from the Website, confirming that The Trade Desk Tracker was triggered automatically upon visiting the homepage. A GET request to match.adsrvr.org was initiated and returned a 302 redirect status, indicating active engagement with The Trade Desk's tracking infrastructure. This request occurred during the homepage session and without any user interaction, confirming that the tracker was operating in the background to collect session metadata and support behavioral profiling and identity resolution.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 9***




113. ***Figure 10*** below is a screenshot of website activity on the Website, showing a DNS query and corresponding response for data.adsrvr.org, a domain controlled by The Trade Desk. The response includes a CNAME redirection to match.adsrvr.org, confirming active linkage to Trade Desk's tracking infrastructure. This DNS activity occurred during the homepage session and was automatically initiated by the browser without any user interaction, verifying that The Trade Desk Tracker was operational and silently transmitting routing and signaling metadata to a third-party server.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 10***




114. Defendant surreptitiously installed, executed, embedded, or injected The Trade Desk Tracker onto users' browsers by deploying JavaScript code that triggers communication with The Trade Desk's tracking infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to The Trade Desk's servers and transmitting user metadata including IP address, page URL, and unique identifiers. This transmission occurs silently and without any user action, allowing The Trade Desk to capture data about user interactions on the Website in real time.

115. The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

116. The Trade Desk Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

117. The Trade Desk Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers, all of which constitute routing or signaling information under CIPA.

118. The user does not intentionally initiate any communication with The Trade Desk; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, The Trade Desk is able to silently intercept and log communication-related data generated during the user's interaction with the Website. In this way, the Trade Desk Tracker functions as a surveillance mechanism that captures third-party signaling information.

119. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install The Trade Desk Tracker on Plaintiff's and Class Members' browser or to collect or share data with The Trade Desk.

120. Consequently, The Trade Desk Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***5. The Pinterest Tracker***

121. The Pinterest Tracker, commonly known as the Pinterest Tag, is a piece of JavaScript code dynamically injected into the Website to monitor user behavior and relay that information back to Pinterest's advertising platform. When a user visits the Website, the Pinterest Tracker automatically executes and collects data such as page views, page URLs, referrer information, timestamps, anonymous identifiers, and metadata including IP address, device type, and browser details. This information is linked to Pinterest user accounts (when available) or to browser and device fingerprints, allowing Pinterest to associate on-site behavior with user profiles.

122. By transmitting behavioral data to Pinterest, the Pinterest Tracker facilitates identity resolution by linking site activity on ALIEXPRESS to known or inferred Pinterest users. The Pinterest Tracker facilitates targeted advertising by allowing ALIEXPRESS to retarget visitors with personalized ads on Pinterest based on specific interactions with the Website, such as viewing product or store pages. Pinterest also aggregates this data to analyze ad performance and expand reach through lookalike modeling. These functions support data monetization by increasing advertising effectiveness, improving conversion rates, and supplying ALIEXPRESS with actionable insights about user behavior for broader marketing efforts.

123. ***Figure 11*** below is a screenshot from the Website, confirming that the Pinterest Tracker was dynamically injected and triggered automatically during the homepage session. A GET request to ct.pinterest.com was initiated by JavaScript code and returned a 200 OK status. This background request confirms that Pinterest's tracking infrastructure was activated immediately and without any user interaction, enabling the collection of behavioral metadata at the outset of the session.

***Figure 11***




124. Defendant surreptitiously installed, executed, or injected the Pinterest Tracker by deploying Pinterest's JavaScript tracking code through dynamic injection on the Website. When a user visits the Website, their browser executes the script, which transmits data about the user's interactions including the user's IP address, page URL, and other metadata to Pinterest's servers. This communication occurs silently and automatically, without any user action or awareness.

125. The Pinterest Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

126. The Pinterest Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

127. The Pinterest Tracker captures non-content signaling information—such as IP

addresses, URLs visited, timestamps, browser and device identifiers, and referrer data—generated as part of the user's interactions with the Website. This metadata is transmitted from the user's browser directly to Pinterest's servers and reflects addressing and routing details associated with the user's session on the Website.

128. By collecting and transmitting metadata from users' browsers during visits to the Website, Pinterest systematically engages in persistent user tracking, behavioral profiling, and audience segmentation. This occurs without the user's awareness, consent, or any meaningful ability to prevent the collection or dissemination of their personal browsing information.

129. Moreover, by deploying the Pinterest Tracker on the Website, Defendant enabled Pinterest to track users' activity beyond the Website itself. The Pinterest Tracker assigns persistent identifiers that allow Pinterest to monitor user behavior across multiple unrelated websites that deploy Pinterest's tracking technology. As a result, Pinterest is able to compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

130. The Pinterest Tracker initiates a connection to Pinterest's advertising servers (typically at ct.pinterest.com) immediately upon page load. This connection transmits routing and signaling metadata, including the user's IP address, user-agent string, full URL path, referrer header, and timestamp. These data points reveal both the source and destination of the communication, facilitate user ID synchronization across websites, and enable Pinterest to construct cross-site behavioral profiles for use in targeted advertising and audience segmentation. Accordingly, the Pinterest Tracker functions as a pen register and/or trap and trace device and/or process.

131. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Pinterest Tracker or to collect or share data with Pinterest.

132. Defendant's secret installation of the Pinterest Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***6. Rubicon Tracker***

133. The Rubicon Tracker is a programmatic advertising technology operated by Magnite, Inc., the parent company of the legacy Rubicon Project. It is designed to enable real-time bidding, identity matching through user ID synchronization mechanisms, and behavioral profiling through its integration into publisher websites. The Rubicon Tracker operates across a wide array of domains including rubiconproject.com, prebid-a.rubiconproject.com, and fastlane.rubiconproject.com, and supports header bidding auctions and audience segmentation across the open web.

134. When deployed on the Website, the Rubicon Tracker collects and transmits metadata such as page URLs, referrer headers, IP addresses, timestamps, and device-level information including screen resolution, operating system, and browser identifiers. The Rubicon Tracker facilitates cookie synchronization and executes real-time ad auctions, transmitting user metadata to advertisers who place bids on impressions based on behavioral and contextual signals. These operations drive persistent tracking of user activity across websites, devices, and sessions.

135. The Rubicon Tracker logs user interactions and interest signals from the Website, such as page navigation, product view events, and session duration. These data points are shared with Rubicon's ad exchange infrastructure and used to facilitate targeted advertising, optimize bid responses, and enhance user-level profiling for downstream ad targeting. The tracker operates automatically during the initial page load without any affirmative action by the user.

136. ***Figure 12*** below is a screenshot from the Website, confirming that the Rubicon Tracker was triggered automatically during the user's session on the homepage. A GET request to pixel.rubiconproject.com, a domain operated by Magnite, Inc., returned a 200 OK status. This request initiated Rubicon's tracking infrastructure, which supports behavioral profiling, audience segmentation, and programmatic ad auctions. The request confirms that the Rubicon Tracker was silently activated as part of the Website's background tracking operations.

/ /

/ /

/ /

/ /

***Figure 12***




137. ***Figure 13*** below is a screenshot of network activity on the Website, showing a DNS query and corresponding response for the domain pixel.rubiconproject.com. This confirms that the Website initiated resolution of Rubicon's tracking domain during the user's session on the homepage. The DNS query was automatically triggered in the background without any user interaction, verifying that the Rubicon Tracker was silently activated and transmitting metadata to a third-party advertising server operated by Magnite, Inc.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

*Figure 13*




138. Defendant surreptitiously installed, executed, embedded, or injected the Rubicon Tracker onto users' browsers by incorporating Rubicon's tracking endpoints into the Website's source code or tag orchestration framework. When a user visits the Website, their browser processes these embedded tracking elements, initiating background requests that transmit metadata including IP address, referrer data, and interaction signals to Rubicon's servers as part of third-party advertising operations.

139. The Rubicon Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

140. The Rubicon Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

141. The Rubicon Tracker initiates a connection to its ad infrastructure upon page load via an embedded tracking pixel. It captures user metadata such as IP address, page path, timestamp, and unique identifiers all of which constitute routing or signaling information under CIPA.

142. The Rubicon Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures addressing and signaling metadata—

including page URLs, device identifiers, timestamps, and referrer data—associated with electronic communications between the user and the Website. These signals are silently diverted to Rubicon's servers, enabling user tracking and advertising profile construction in real time.

143. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Rubicon Tracker on Plaintiff's and Class Members' browser or to collect or share data with Rubicon's servers.

144. Consequently, the Rubicon Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

## VI. CLASS ALLEGATIONS

145. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

146. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

147. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;

- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates the Cal. Civil Code § 1798.100, *et seq.;*
- Whether the Defendant's conduct violates CIPA; and
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice.

148. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

149. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

150. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

**FIRST CAUSE OF ACTION**

**Violations of Cal. Penal Code § 638.51**

***By Plaintiff and the Class Members Against All Defendants***

151. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

152. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

153. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP

address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

154. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## SECOND CAUSE OF ACTION

**Violations of Cal. Civil Code § 1798.100, *et seq.***

***By Plaintiff and the Class Members Against All Defendants***

155. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

156. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

157. The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civil Code § 1798.100 *et seq*.

158. The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

159. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

160. Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

161. Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

162. By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice, Defendant violated CCPA.

163. By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

164. Defendant has violated Cal. Civil Code § 1798.100(b) by failing to provide notice "at or before" collection of personal information.

165. Defendant has violated Cal. Civil Code § 1798.120(a) by failing to provide consumers the ability to opt out before sharing their personal information including for cross-contextual behavioral advertising purposes.

166. Defendant subjected Plaintiff and the Class Members' nonencrypted and nonredacted personal information to an unauthorized disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices in violation of Civil Code § 1798.150(a)(1).

167. Defendant has violated Cal. Civ. Code § 1798.115(d) by failing to inform consumers, at or before collection, of the categories of third parties to whom personal information is disclosed.

168. Defendant has violated Cal. Civ. Code § 1798.130(a)(5) by failing to provide a clear and conspicuous link titled "Do Not Sell or Share My Personal Information" at the point of entry.

169. Defendant has violated Cal. Civ. Code § 1798.135(a)(1) by sharing personal information for cross-context behavioral advertising before presenting consumers with the opportunity to opt out.

170. Defendant has violated Cal. Civ. Code § 1798.110(c) by failing to offer accessible methods for consumers to request the personal information collected and shared about them.

171. On June 17, 2025, Plaintiff provided Defendant with written notice pursuant to California Civil Code § 1798.150(b), identifying the specific provisions of the CCPA that Defendant

violated. The letter was sent on behalf of Plaintiff and all others similarly situated.

172. Plaintiff, on behalf of himself and the Class Members, hereby seeks injunctive relief and statutory damages pursuant to California Civil Code § 1798.150.

## THIRD CAUSE OF ACTION
### Violations of Business & Professions Code § 17200
***By Plaintiff and the Class Members Against All Defendants***

173. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

174. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

175. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

176. Defendant has engaged in unlawful business practices by:

(a) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(b) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice. Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

177. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

178. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

179. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from

its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

180. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

181. Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates CIPA, the CCPA, and Business & Professions Code § 17200;
3. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein;
5. Statutory damages under CIPA and CCPA;
6. Prejudgment interest;
7. Reasonable attorney's fees and costs; and
8. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated: September 5, 2025

**BURSOR & FISHER, P.A.**

By: */s/ Daniel S. Guerra*
Daniel S. Guerra

L. Timothy Fisher (SBN 191626)
Daniel S. Guerra (SBN 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com

Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 – 1989
Big Bear Lake, CA 92315
Office : (562) 612-1708
Email : rc@rosscornelllaw.com

*Attorneys for Plaintiff*