**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Daniel S. Guerra (SBN 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
dguerra@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Telephone: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH ABDULLAH on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>ALIEXPRESS E-COMMERCE ONE PTE., LTD.,<br><br>Defendant. | Case No. 3:25-cv-05206-CRB<br><br>Hon. Charles R. Breyer<br><br>**THIRD AMENDED COMPLAINT**<br><br>1. Cal. Penal Code § 638.51<br><br>CLASS ACTION – JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1. Defendant ALIEXPRESS E-COMMERCE ONE PTD., LTD. ("Defendant" or "ALIEXPRESS") owns and operates a website, www.aliexpress.us (the "Website").

2. This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3. Plaintiff JOSEPH ABDULLAH files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP addresses, browser and device details, and other interaction metadata.

6. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Ads/DoubleClick Tracker
- Facebook Pixel Tracker
- Bing/Microsoft Ads Tracker
- The Trade Desk Tracker
- Pinterest Tracker
- Rubicon Tracker
- Taboola Tracker

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization

strategies that go beyond Defendant's direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8. The Trackers are operated by distinct third parties: Google LLC (Google Ads/DoubleClick Tracker); Meta Platforms, Inc. (Facebook Pixel Tracker); Microsoft Corporation (Bing/Microsoft Ads Tracker); The Trade Desk, Inc. (The Trade Desk Tracker); Pinterest, Inc. (Pinterest Tracker); Magnite, Inc. (Rubicon Tracker); and Taboola, Inc., (Taboola Tracker). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9. Through the Trackers, the Third Parties collect detailed user information, including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This User Information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions.

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

12. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

13. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

14. Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

**PARTIES**

15. Plaintiff JOSEPH ABDULLAH ("Plaintiff") is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on at least three distinct dates during the class period in this matter, including but not limited to May 28, 2025, at which time Plaintiff submitted sensitive information on the Website in completing a purchase from the Website with his credit card. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16. Defendant ALIEXPRESS E-COMMERCE ONE PTD., LTD. is a Private Limited Company that owns, operates, and/or controls the Website, which is an online platform that offers goods and services to consumers.

17. ALIEXPRESS is a multinational technology company specializing in e-commerce, retail, internet, and technology services. Through its various platforms including the Website, ALIEXPRESS operates one of the world's largest online marketplaces, connecting millions of buyers and sellers across the globe. The company maintains a significant commercial footprint in the United States and facilitates cross-border trade, digital storefronts, and product discovery for a wide range of goods and services.

18. The Website functions as a core consumer-facing platform within ALIEXPRESS's broader commercial ecosystem. While ALIEXPRESS supports a range of merchant services and digital infrastructure, the Website is directly responsible for facilitating retail transactions, processing customer payments, and managing communications between buyers and sellers. In the course of operating the Website, ALIEXPRESS collects and processes significant volumes of user data for purposes that include transaction fulfillment, behavioral profiling, and digital advertising, all of which give rise to obligations under California and federal privacy law.

19. The Website serves as ALIEXPRESS's primary digital storefront. It allows users to explore product listings, save favorites, manage accounts, and complete purchases. In addition to these retail functions, the Website also operates as a behavioral tracking and advertising platform.

Through the deployment of third-party tracking technologies, including advertising pixels, event tracking scripts, and behavioral monitoring tools, ALIEXPRESS collects granular data about user interactions with the site. These data practices form a core component of ALIEXPRESS's performance marketing and ad-targeting strategy, and raise serious legal concerns under the California Invasion of Privacy Act (CIPA) and other consumer privacy statutes.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

21. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Northern District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

22. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## GENERAL ALLEGATIONS

### I. THE CALIFORNIA INVASION OF PRIVACY ACT (CIPA)

23. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon

private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

24. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

25. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

26. Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

27. In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

28. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

29. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

30. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

31. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory

scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

32. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

33. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

34. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

## II. THE TRACKERS ARE "PEN REGISTERS" AND/OR "TRAP AND TRACE DEVICES"

35. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, e.g. what images to load, what text should appear, or what music should play.

36. In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

37. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests**.**

***Figure 1***:




38. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side

functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

39. The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

40. Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

41. An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.,* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

42. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth

[1] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

43. Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

44. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

45. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

46. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

47. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone

number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

48. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

***Figure 2***:




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

49. Thus, the differences between public and private IP addresses are as follows:[3]

//

//

//

//

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] *What's The Difference Between a Public and Private IP Address?*, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

***Figure 3***:

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

50. A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

51. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient connection over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

52. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

53. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

54. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

55. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

56. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool, supra* note 5.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

57. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

58. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

59. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

60. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

61. The collection of IP addresses here is particularly invasive here: As a report from NATO found:

---

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Williams, *supra* note 7.

[15] *Id.*

[16] *Id.*

[17] *Id.*

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

62. In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

63. In connection with Plaintiff's visits, Defendant's Website caused Plaintiff's browser to transmit Plaintiff's public IP address to multiple third-party tracking vendors together with page-level URLs, referrer information, timestamps, and persistent identifiers generated during Plaintiff's use of the Website. Plaintiff's IP address identified Plaintiff's device on the network and permitted third parties to associate Plaintiff's browsing activity with a general geographic location and with a persistent user identifier. In combination with the other session-level information transmitted during Plaintiff's visit, Plaintiff's IP address enabled third parties to link Plaintiff's page views together, recognize Plaintiff across multiple requests, and associate Plaintiff's browsing behavior with a user profile maintained outside the Website.

64. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

---

[18] Henrik Twetman & Gundars Bergmanis-Korats, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] *Is an IP Address Personal Data?*, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

65. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

66. Oftentimes, third-party scripts are installed on websites "for advertising purposes."[21]

67. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

68. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

69. As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

70. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

71. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

72. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

## III. THE USE OF PIXEL TRACKERS OR BEACONS AND DIGITAL FINGERPRINTING

73. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness. These transmissions occurred silently, automatically, and without meaningful visual indication to Plaintiff; no disclosure, banner, or mechanism presented at the time of transmission to reasonably alert Plaintiff that his device would serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

74. The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution endpoints before the requested pages finished loading or became visible on his device.

75. The tracking technologies deployed on the Website also caused additional technical and identifying data to be transmitted from Plaintiff's and Class Members' browsers to third-party tracking vendors. In addition to the public IP address, this data included the user-agent string identifying the browser, operating system, and device type, as well as device and browser capability information communicated as part of routine web requests. These transmissions were accompanied by persistent identifiers assigned by third-party vendors, which enabled those entities

to recognize the same browser across multiple requests during the browsing session and to associate the transmitted data with a user profile maintained outside Defendant's Website. In combination, these elements allowed third parties to distinguish Plaintiff from other users and to associate Plaintiff's browsing activity with a persistent, identified profile for analytics, advertising, and behavioral profiling purposes.

76. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

77. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

78. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

79. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications.

This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

80. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

81. When Plaintiff visited the Website, third-party tracking technologies installed, executed, embedded, or injected by Defendant initiated network requests from Plaintiff's browser to third-party servers using invisible image pixels, JavaScript calls, or similar web-beacon mechanisms. Those requests were generated automatically as part of rendering the Website and included Plaintiff's public Internet Protocol ("IP") address as routing and addressing information transmitted in the HTTP request. In connection with these requests, third-party servers responded by setting or accessing persistent identifiers in Plaintiff's browser, which enabled those third parties to recognize Plaintiff's browser across multiple requests during the browsing session and to associate Plaintiff's activity with a user profile maintained outside Defendant's Website.

82. These transmissions occurred in connection with Plaintiff's actual use of the Website. As Plaintiff accessed the homepage and navigated to product-category and product-listing pages, his browser generated outbound network requests associated with those page loads and navigational steps, which automatically transmitted page URLs, referrer information, timestamps, and browser and device metadata to third-party servers. The Specific Allegations section below describes representative examples of these transmissions and identifies the third-party recipients involved.

## IV. PLAINTIFF'S AND CLASS MEMBERS' DATA HAS FINANCIAL VALUE

83. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

[23] Ian Cohen, *Are Web-Tracking Tools Putting Your Company at Risk?*, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

84. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

85. There is "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

86. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

87. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

---

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown et al.,*Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[27] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, NO. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

88. The last estimate probably reflects public reporting that identity theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

89. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

90. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

## V. DEFENDANT IS MOTIVATED TO MONETIZE CONSUMER INFORMATION REGARDLESS OF CONSENT

91. By implementing third-party tracking technologies on the Website, Defendant enabled the collection and aggregation of visitors' browsing behavior into behavioral profiles maintained by Defendant and its third-party tracking partners. As alleged above, these profiles are built from page-level navigation data, timestamps, persistent identifiers, and associated technical information reflecting which pages a visitor viewed and how the visitor interacted with the Website during a browsing session. For Plaintiff, this included the tracking and aggregation of his page views and navigation paths during his visit. For members of the Class, the same tracking mechanisms operate in the same manner whenever they visit the Website, permitting recognition of returning browsers or devices and the association of browsing activity with previously observed behavior. This aggregated behavioral data is used by Defendant and its advertising partners to analyze user engagement, measure interest in products or categories, and support targeted advertising and marketing strategies based on observed browsing behavior.

[28] Bradley J. Fikes, *Identity Theft Hits Millions, Report Says*, SAN DIEGO UNION TRIBUNE, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

92. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

93. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

94. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

## VI. DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

95. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

96. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

97. To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

98. In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### A. Data Brokers And Real-Time Bidding: The Information Economy

*Data Brokers*

99. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

---

[29] Justin Sherman, *Duke Sanford Cyber Policy Program, Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

100. Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). Here, Taboola, Inc. is a registered data broker operating the Taboola Tracker embedded by Defendant on the Website.

101. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

102. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

103. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

---

[30] Sherman, *supra* note 29, at 2.

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[32] Twetman & Bergmanis-Korats, *supra* note 18, at 11.

[33] Sherman, *supra* note 29, at 1.

[34] *Id.*

104. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

105. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

106. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

---

[35] *Id.* at 9.

[36] *Id.*

[37] Tweetman & Bergmanis-Korats, *supra* note 18, at 8.

***Figure 4***:




107. As noted above, data brokers like Taboola are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

[38] *Id.* at 11.

108. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

109. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

110. In short, by collecting IP addresses Device Metadata, and User Information, data brokers like Taboola and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

111. As a result of Defendant's installation of trackers operated by data brokers and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles maintained by those brokers, or used to generate new ones. This linkage occurs through the collection of IP addresses, device metadata, and other user information from the browsers of Defendant's Website visitors.

112. These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

113. Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

114. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

115. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

116. In other words, SSPs provide user information to advertisers that might be interested in those users, a DSP like The Trade Desk is the platform on which all of this happens.

117. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, The Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id.*

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

***<u>Figure 5</u>***:




118. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> [T]he economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road.
>
> The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

> SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

***Figure 6***:




119. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

120. Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

121. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

122. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

(a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [i.e., Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b) "send[ing] sensitive data across geographic borders."

(c) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways." [46]

123. Given The Trade Desk operates as DSP's here, the last point is particularly relevant, as it means Google collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

124. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

125. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

//

//

//

//

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[47] Geoghegan, *supra*.

[48] Dr. Johnny Ryan, *"RTB" Adtech & GDPR*, https://assortedmaterials.com/rtb-evidence/ (video).

***Figure 7***:




126. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

127. It should now be clear both the capabilities of the Third Parties (i.e., data brokers like Taboola who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

128. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

129. Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web*.[51]

//

//

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

[51] Papadopoulos, *supra* note 49, at 1433.

***Figure 8***:




130. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

131. On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state

[52] *Id.* at 1434.

[53] *Id.*

[54] *See id.*

erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

132. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

133. The tracking activity at issue does not depend on users remaining anonymous. When the Trackers deployed on the Website execute within a user's browser, they assign and transmit persistent identifiers and related signaling data to their respective third-party operators as part of ordinary analytics, advertising, and session-measurement functions. As a result, the same browser or device can be recognized across multiple pageviews and visits to the Website by those third parties. This persistence allows third-party platforms to associate a user's browsing activity with an identifiable browser or device profile over time, thereby eliminating true anonymity during visits to the Website, even in the absence of account login or user-provided identifying information.

134. To summarize the proceeding allegations, data brokers like Taboola focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

135. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

[55] *Id.*

[56] *Id.* at 1441.

136. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

137. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

138. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

139. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

140. Defendant deploys third-party tracking technologies on the Website that collect and transmit information about users' browsing activity for analytics, advertising, and marketing purposes. Some of these tracking technologies are loaded through tag-management and similar orchestration tools, while others are embedded directly within the Website's code and execute automatically when a page is loaded. When these technologies execute, they generate outbound network requests that capture page-level interactions, including pageviews, navigation sequences,

and associated session metadata. The transmitted information is linked to browser- and device-level identifiers, such as cookies and advertising identifiers, which enable third parties to recognize the same browser across multiple requests and to associate observed browsing behavior with a persistent, pseudonymous user profile maintained outside Defendant's Website.

141. The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

142. On information and belief, The Trade Desk, Inc. operates as a demand-side advertising platform in connection with the Website, facilitating the purchase, delivery, and measurement of advertising across third-party websites and applications. As deployed on Defendant's Website, tracking technologies associated with The Trade Desk receive dialing, routing, addressing, and signaling ("DRAS") information generated during visitors' browsing activity, including page-level URLs, referrer headers, timestamps, and third-party advertising identifiers transmitted automatically in connection with page loads and navigation events. On information and belief, this information enables The Trade Desk to recognize and associate browser-level activity across multiple requests and to incorporate signals originating from the Website into advertising audiences and campaign-level analytics used for targeted advertising delivery and measurement. Through this process, navigation signals generated during visits to the Website are ingested into a demand-side advertising system consistent with programmatic advertising operations.

## VII. PLAINTIFF'S PERSONAL BEHAVIORAL INFORMATION WAS TRACKED

143. During his Website use, Plaintiff navigated beyond the homepage and viewed multiple commercial pages displaying products available for purchase, including product-category and search-results pages relating to home furnishings, personal-care items, and exercise equipment.

144. As Plaintiff loaded each of those pages, Defendant caused Plaintiff's browser to automatically transmit the actual URLs identifying those pages, or encoded equivalents revealing the same page-level information, to multiple third-party tracking vendors. The transmitted URLs disclosed to those third parties the specific commercial pages Plaintiff viewed and the categories of products Plaintiff was browsing during the session.

145. In addition to the page URLs themselves, Defendant caused Plaintiff's browser to transmit referrer information identifying the immediately preceding Website page from which Plaintiff navigated. This referrer information revealed how Plaintiff moved from one page to another and allowed third parties to reconstruct Plaintiff's navigation path across multiple pages on the Website. Defendant also caused Plaintiff's browser to transmit timestamped page-view events for each page Plaintiff visited, reflecting when each page was loaded and the sequence of Plaintiff's browsing activity.

146. The page URLs, referrer information, and page-view events transmitted to third parties were accompanied by persistent unique identifiers, including analytics and advertising identifiers assigned to Plaintiff's browser. These identifiers enabled third parties to associate all of Plaintiff's page views during the session with the same individual user and to link Plaintiff's browsing activity across multiple pages as part of a single behavioral profile. Through these transmissions, third parties were able to observe, record, and aggregate Plaintiff's browsing behavior, including which commercial pages Plaintiff viewed, the order in which those pages were accessed, and the timing of those views, without any real-time notice to Plaintiff or opportunity to prevent such disclosures.

147. The information transmitted to third parties reflected Plaintiff's actual, session-specific browsing behavior on the Website. The transmitted URLs and navigation data revealed Plaintiff's individualized shopping interests, browsing patterns, and on-site behavior. Defendant's disclosures enabled third parties to monitor and record Plaintiff's online activity at a granular, session-level detail and to associate that activity with a persistent identifier tied to Plaintiff, thereby subjecting Plaintiff to unauthorized tracking and profiling of his online behavior regardless of the sensitivity of the underlying products displayed.

148. In connection with each of these transmissions, Defendant caused Plaintiff's browser to initiate outbound network requests to third-party tracking vendors that necessarily included Plaintiff's IP address as routing and addressing information. Plaintiff's IP address permitted third parties to infer Plaintiff's general geographic location, such as the state or region from which Plaintiff accessed the Website, and to associate Plaintiff's browsing behavior with a location-based profile linked to Plaintiff's persistent identifiers.

149. The combination of page-level URLs, referrer chains, timestamps, persistent identifiers, and IP-based location information transmitted during Plaintiff's session enabled third parties to associate Plaintiff's browsing behavior with an identified user profile and to retain that information for use beyond the duration of Plaintiff's visit.

## VIII. DEFENDANT HAS BEEN UNJUSTLY ENRICHED

150. Defendant's Privacy Policy acknowledges that it engages in behavioral advertising and frames that activity as distinct from the use of direct identifiers. Defendant's policy states that it uses personal data for "[a]dvertising, such as sending and serving tailored marketing and advertising that we believe will be of interest to you based on the ways in which you use the Platform, your browsing records, and order history," and that it may use "cookies and other similar technologies to provide you with marketing and advertising based upon your browsing activities and interests." At the same time, Defendant represents that "[w]e do not use information that personally identifies you (such as name or email address) to serve interest-based ads." This framing draws a distinction between direct identifiers and other forms of user-level identification, even though interest-based advertising relies on browsing behavior and online identifiers to recognize and target individual users.

151. Defendant's privacy policy further discloses that the Website automatically collects usage and identifier data, including "IP addresses, date and time of access to the Platform, device type, unique device identification numbers, browser type, broad geographic location … browsing patterns and details of how you have interacted with our Platform," as well as information regarding "pages viewed." Defendant also states that it shares such information with "[m]arketing and advertising partners, such as Google, X, Facebook, and Instagram," and expressly

acknowledges that "[t]hese partners may combine information they collect on our Platform with data on their platforms and data they collect from other websites or through other sources in order to conduct targeted advertising." These disclosures reflect that Defendant enables the transmission and combination of browsing behavior and online identifiers in support of cross-context behavioral advertising, notwithstanding its representation that advertising does not involve information that personally identifies users by name or email address.

152. Defendant's privacy policy further suggests that these advertising and tracking practices are subject to user control and choice, stating that cookies are used subject to users' "rights to control them" and that users may opt out of personalized advertising "by changing your cookies choices." As alleged, however, the interception and disclosure of user browsing data and identifiers for advertising purposes occurs automatically upon use of the Website and before any meaningful opportunity to exercise such choices is presented. In this manner, Defendant facilitates the transmission of routing, addressing, and signaling information to advertising partners contemporaneously with a user's visit, notwithstanding policy language suggesting that such practices are both non-identifying and user-controlled.

153. The foregoing conduct constitutes a concrete privacy and economic injury with a close relationship to historically recognized common-law unjust enrichment. By providing access to and use of the Website under representations suggesting anonymity and user control, while simultaneously and automatically intercepting and disclosing their routing, addressing, signaling, and behavioral data to third parties for advertising and marketing purposes, Defendant extracts commercial value from users' information without their informed consent through fraud and coercion. This compelled transfer of valuable user data as a condition of accessing the Website unjustly enriches Defendant and its advertising partners at users' expense and mirrors traditional restitutionary wrongs in which one party benefits from another's property through deception or other inequitable conduct. Plaintiff's injury is therefore concrete and particularized, independent of any statutory violation, and sufficient to confer Article III standing.

## SPECIFIC ALLEGATIONS

### A. Google Ads/DoubleClick Tracker

154. Google advertising and analytics technologies, including Google Tag Manager, Google Analytics, and Google Ads attribution services (collectively, the "Google Tracking Technologies"), are operated by Google LLC and are used to collect page-level usage, analytics, and advertising attribution data from websites. As deployed on the Website, these technologies are loaded through Google Tag Manager and related Google endpoints and are designed to record page views, session activity, and advertising attribution signals associated with a user's visit.

155. When implemented by Defendant on the Website, Google's tracking technologies executed automatically during the initial page load and transmitted page-level metadata to Google-controlled servers. As shown in Figure 9 below, a request to googletagmanager.com/gtm.js was initiated at the outset of the session and included AliExpress' Google Tag Manager container identifier, enabling the loading and execution of additional Google tracking technologies without any user interaction.

***<u>Figure 9</u>***:




156. Network-level evidence confirms that these connections occurred immediately and prior to any consent. As shown in Figure 10 below, packet-capture evidence reflects DNS resolutions for googletagmanager.com within the first seconds of page load, confirming that

Plaintiff's browser connected to Google's infrastructure at the network level before any notice or choice was presented.

***Figure 10***:




157. Google also placed persistent identifiers in Plaintiff's browser automatically upon page load. As shown in Figure 11 below, browser storage contained Google cookies including _ga, a persistent Google Analytics client identifier; _gid, a session-level identifier; and _gcl_au, a Google Ads attribution cookie. These identifiers were written without any affirmative action by Plaintiff and enabled Google to recognize the same browser across multiple requests and sessions and to associate browsing activity with advertising attribution.

//

//

//

//

//

//

//

***Figure 11***:




158. In addition to setting identifiers, Google received page-view event payloads containing unique identifiers and browsing metadata. As shown in Figure 12 below, a request to analytics.google.com/g/collect transmitted parameters including a unique client identifier (cid), a session identifier (sid), AliExpress' Google Analytics property identifier (tid), the full page URL (dl), and the page title (dt). This transmission confirms that Google received both persistent identifiers and page-level navigation information contemporaneously with the initial page load.

***Figure 12***:



159. Through these mechanisms, Defendant caused Plaintiff's browser to initiate outbound network requests that transmitted routing, addressing, and signaling information to Google, including IP address, page location, referrer context, timestamps, and persistent analytics and advertising identifiers. These transmissions occurred automatically as part of rendering the Website and without any real-time notice to or authorization from Plaintiff.

160. The Google Tracking Technologies are at least a process because they consist of software that captures, identifies, and correlates signaling information associated with electronic communications between users and the Website.

161. The Google Tracking Technologies are also at least a device because they operate by executing software on users' computing devices to initiate network communications and transmit metadata. *See, e.g., James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

162. The Google Tracking Technologies function as a pen register and/or trap-and-trace device or process under the California Invasion of Privacy Act because they capture and transmit addressing and signaling information, including page URLs, timestamps, referrer data, and unique identifiers, associated with Plaintiff's electronic communications with the Website. These signals are silently diverted to Google's servers during page load, enabling the logging and association of Plaintiff's browsing activity with Google-maintained identifiers for analytics and advertising attribution purposes.

163. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install or execute the Google Tracking Technologies on users' browsers or to transmit their routing, addressing, or signaling information to Google.

164. Accordingly, Defendant's deployment and use of the Google Tracking Technologies constitutes the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of the California Invasion of Privacy Act, including California Penal Code § 638.51.

**B. The Facebook Tracker**

165. Meta Platforms, Inc. operates the Facebook Tracker, a third-party advertising and behavioral tracking technology designed to collect page-view and navigation data from websites and transmit that information to Meta's advertising infrastructure. The Facebook Tracker is used to record user interactions with webpages and associate those interactions with persistent browser-level identifiers for advertising and analytics purposes.

166. When deployed by Defendant on the Website, the Facebook Tracker executed automatically during the initial page load and transmitted page-view event data to Meta-controlled servers. As shown in Figure 13 below, a request to https://www.facebook.com/tr/ was initiated at the outset of Plaintiff's visit and included parameters identifying AliExpress' assigned Facebook Tracker ID, the event type ev=PageView, and the full page URL (dl) of the page Plaintiff visited. This request confirms that Meta received page-level navigation data contemporaneously with the page load.

***Figure 13*:**




167. Network-level evidence confirms that these transmissions occurred immediately and prior to any user consent. As shown in Figure 14 below, packet-capture evidence reflects DNS resolutions for connect.facebook.net and facebook.com within the first seconds of the session,

confirming that Plaintiff's browser initiated connections to Meta's tracking infrastructure at the network level before any notice or choice was presented.

***Figure 14***:




168. Meta also placed and accessed a persistent identifier in Plaintiff's browser automatically upon page load. As shown in Figure 15 below, browser storage contained the cookie _fbp, a Facebook Browser ID used to persistently identify browsers and associate browsing activity with Meta's advertising systems. The _fbp cookie was present during the initial page load and was stored without any affirmative action by Plaintiff.

***Figure 15***:




169. Through these mechanisms, Defendant caused Plaintiff's browser to initiate outbound network requests that transmitted routing, addressing, and signaling information to Meta, including IP address, page location, referrer context, timestamps, and persistent advertising identifiers. These transmissions occurred automatically as part of rendering the Website and without any real-time notice to or authorization from Plaintiff.

170. The Facebook Tracker is at least a process because it consists of software that captures, identifies, and correlates signaling information associated with electronic communications between users and the Website.

171. The Facebook Tracker is also at least a device because it operates by executing software on users' computing devices to initiate network communications and transmit metadata. *See, e.g., James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

172. The Facebook Tracker functions as a pen register and/or trap-and-trace device or process under the California Invasion of Privacy Act because it captures and transmits addressing and signaling information, including page URLs, timestamps, referrer data, and persistent identifiers, associated with Plaintiff's electronic communications with the Website. These signals were silently routed to Meta's servers during page load, enabling Meta to log and associate Plaintiff's browsing activity with a browser-level identifier.

173. Defendant did not obtain a court order authorizing the installation or use of a pen register and/or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install or execute the Facebook Tracker on users' browsers or to transmit their routing, addressing, or signaling information to Meta.

174. Accordingly, Defendant's deployment and use of the Facebook Tracker constitutes the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of the California Invasion of Privacy Act, including California Penal Code § 638.51.

**C. The Microsoft Bing Ads Tracker**

175. Microsoft Corporation operates the Microsoft Bing Ads Tracker, also known as the Universal Event Tracking ("UET") system, a third-party advertising and analytics tracking technology designed to collect page-view and attribution data from websites and transmit that information to Microsoft's advertising infrastructure. The Microsoft Bing Ads Tracker is used to record page-load events and associate those events with persistent browser- and device-level identifiers for advertising measurement and targeting purposes.

176. When deployed by Defendant on the Website, the Microsoft Bing Ads Tracker executed automatically during the initial page load and transmitted event-level data to Microsoft-controlled servers. As shown in Figure 16 below, a request to https://bat.bing.com/action/0 was initiated at the outset of Plaintiff's visit and included parameters identifying a session identifier (sid), a persistent visitor identifier (vid), a machine identifier (mid), the full page URL of the visited AliExpress page (p), and an event classification indicating a page-load event (lt=pageLoad). This request confirms that Microsoft received unique identifiers and page-level navigation data contemporaneously with the initial page load.

***Figure 16***:




177. Network-level evidence confirms that these communications occurred immediately and prior to any user consent. As shown in Figure 17 below, packet-capture evidence reflects DNS resolution for bat.bing.com within the first seconds of page load, confirming that Plaintiff's browser initiated communication with Microsoft's tracking infrastructure at the network level before any notice or choice was presented.

***Figure 17***:



178. Through these mechanisms, Defendant caused Plaintiff's browser to initiate outbound network requests that transmitted routing, addressing, and signaling information to Microsoft, including IP address, page location, timestamps, and persistent identifiers associated with the browser and device. These transmissions occurred automatically as part of rendering the Website and without any real-time notice to or authorization from Plaintiff.

179. The Microsoft Bing Ads Tracker is at least a process because it consists of software that captures, identifies, and correlates signaling information associated with electronic communications between users and the Website.

180. The Microsoft Bing Ads Tracker is also at least a device because it operates by executing software on users' computing devices to initiate network communications and transmit metadata. *See, e.g., James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

181. The Microsoft Bing Ads Tracker functions as a pen register and/or trap-and-trace device or process under the California Invasion of Privacy Act because it captures and transmits addressing and signaling information, including page URLs, timestamps, session identifiers, persistent visitor identifiers, and device-level identifiers, associated with Plaintiff's electronic communications with the Website. These signals were silently routed to Microsoft's servers during page load, enabling Microsoft to log and associate Plaintiff's browsing activity with advertising identifiers.

182. Defendant did not obtain a court order authorizing the installation or use of a pen register and/or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install or execute the Microsoft Bing Ads Tracker on users' browsers or to transmit their routing, addressing, or signaling information to Microsoft.

183. Accordingly, Defendant's deployment and use of the Microsoft Bing Ads Tracker constitutes the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of the California Invasion of Privacy Act, including California Penal Code § 638.51.

**D. The Trade Desk Tracker**

184. The Trade Desk Tracker—typically delivered via the domain adsrvr.org—is a third-party behavioral tracking pixel operated by The Trade Desk, Inc. On the Website, this tracker is dynamically injected into users' browsers upon visiting the site. The tracker initiates a connection to The Trade Desk's servers and captures a range of data points including IP address, device type, browser version, geolocation, and unique cookie or device identifiers. These transmissions occur silently and without user interaction, confirming that user activity is being monitored in real time for purposes of behavioral profiling, identity resolution, and targeted advertising.

185. Once activated, the Trade Desk Tracker plays a central role in identity resolution by assigning users a persistent identifier that can be recognized across other websites, apps, and devices. This is accomplished through techniques such as cookie syncing and probabilistic matching, tools that allow The Trade Desk to correlate behavioral data collected on the Website with broader user profiles across the internet. These mechanisms enable The Trade Desk to build a cohesive view of an individual's online behavior even when they are not logged in.

186. The Trade Desk Tracker facilitates targeted advertising by enabling Defendant to reach users who previously visited the Website, interacted with specific content, or initiated transactions. This includes retargeting individuals with personalized ads served across a broad advertising ecosystem spanning thousands of partner websites and ad exchanges. The Trade Desk's data enrichment tools allow Defendant to identify behavioral traits among its site visitors and assemble lookalike audiences composed of users who exhibit similar interests or attributes. These capabilities significantly expand Defendant 's ability to re-engage high-value users and acquire new customers aligned with its marketing objectives.

187. The Trade Desk Tracker supports Defendant 's broader objective of data monetization by transforming real-time behavioral signals into actionable, revenue-generating insights. By tracking users across multiple touchpoints and matching them to advertising segments, Defendant gains access to detailed performance analytics and the ability to optimize ad spend. The data collected feeds into a programmatic ad-buying ecosystem where advertisers compete to show personalized ads to high-value users often based on the very behavioral traits

observed on the Website. In this way, The Trade Desk enables Defendant to extract commercial value from user activity, while facilitating profiling and ad delivery practices.

188. Figure 18 below confirms that The Trade Desk Tracker was triggered automatically upon visiting the homepage. A GET request to `match.adsrvr.org` was initiated and returned a 302 redirect status, indicating active engagement with The Trade Desk's tracking infrastructure. This request occurred during the homepage session and without any user interaction, confirming that the tracker was operating in the background to collect session metadata and support behavioral profiling and identity resolution.

***Figure 18***:




189. Figure 19 below shows a DNS query and corresponding response for data.adsrvr.org, a domain controlled by The Trade Desk. The response includes a CNAME redirection to match.adsrvr.org, confirming active linkage to Trade Desk's tracking infrastructure. This DNS activity occurred during the homepage session and was automatically initiated by the browser without any user interaction, verifying that The Trade Desk Tracker was operational and silently transmitting routing and signaling metadata to a third-party server.

***Figure 19***:




190. Defendant surreptitiously installed, executed, embedded, or injected The Trade Desk Tracker onto users' browsers by deploying JavaScript code that triggers communication with The Trade Desk's tracking infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to The Trade Desk's servers and transmitting user metadata including IP address, page URL, and unique identifiers. This transmission occurs silently and without any user action, allowing The Trade Desk to capture data about user interactions on the Website in real time.

191. The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

192. The Trade Desk Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See, e.g., James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

193. The Trade Desk Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path,

timestamp, and unique identifiers, all of which constitute routing or signaling information under CIPA.

194. The user does not intentionally initiate any communication with The Trade Desk; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, The Trade Desk is able to silently intercept and log communication-related data generated during the user's interaction with the Website. In this way, the Trade Desk Tracker functions as a surveillance mechanism that captures third-party signaling information.

195. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install The Trade Desk Tracker on Plaintiff's and Class Members' browser or to collect or share data with The Trade Desk.

196. Consequently, The Trade Desk Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**E. The Pinterest Tracker**

197. The Pinterest Tracker, commonly known as the Pinterest Tag, is a piece of JavaScript code dynamically injected into the Website to monitor user behavior and relay that information back to Pinterest's advertising platform. When a user visits the Website, the Pinterest Tracker automatically executes and collects data such as page views, page URLs, referrer information, timestamps, anonymous identifiers, and metadata including IP address, device type, and browser details. This information is linked to Pinterest user accounts (when available) or to browser and device fingerprints, allowing Pinterest to associate on-site behavior with user profiles.

198. By transmitting behavioral data to Pinterest, the Pinterest Tracker facilitates identity resolution by linking site activity on Defendant to known or inferred Pinterest users. The Pinterest Tracker facilitates targeted advertising by allowing Defendant to retarget visitors with personalized ads on Pinterest based on specific interactions with the Website, such as viewing product or store pages. Pinterest also aggregates this data to analyze ad performance and expand reach through lookalike modeling. These functions support data monetization by increasing advertising

effectiveness, improving conversion rates, and supplying Defendant with actionable insights about user behavior for broader marketing efforts.

199. Figure 20 below confirms that the Pinterest Tracker was dynamically injected and triggered automatically during the homepage session. A GET request to `ct.pinterest.com` was initiated by JavaScript code and returned a 200 OK status. This background request confirms that Pinterest's tracking infrastructure was activated immediately and without any user interaction, enabling the collection of behavioral metadata at the outset of the session.

***Figure 20***:




200. Defendant surreptitiously installed, executed, or injected the Pinterest Tracker by deploying Pinterest's JavaScript tracking code through dynamic injection on the Website. When a user visits the Website, their browser executes the script, which transmits data about the user's interactions including the user's IP address, page URL, and other metadata to Pinterest's servers. This communication occurs silently and automatically, without any user action or awareness.

201. The Pinterest Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

202. The Pinterest Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See, e.g., James v. Walt Disney Co.,* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

203. The Pinterest Tracker captures non-content signaling information—such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data—generated as part of the user's interactions with the Website. This metadata is transmitted from the user's browser directly to Pinterest's servers and reflects addressing and routing details associated with the user's session on the Website.

204. By collecting and transmitting metadata from users' browsers during visits to the Website, Pinterest systematically engages in persistent user tracking, behavioral profiling, and audience segmentation. This occurs without the user's awareness, consent, or any meaningful ability to prevent the collection or dissemination of their personal browsing information.

205. Moreover, by deploying the Pinterest Tracker on the Website, Defendant enabled Pinterest to track users' activity beyond the Website itself. The Pinterest Tracker assigns persistent identifiers that allow Pinterest to monitor user behavior across multiple unrelated websites that deploy Pinterest's tracking technology. As a result, Pinterest is able to compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

206. The Pinterest Tracker initiates a connection to Pinterest's advertising servers (typically at ct.pinterest.com) immediately upon page load. This connection transmits routing and signaling metadata, including the user's IP address, user-agent string, full URL path, referrer header, and timestamp. These data points reveal both the source and destination of the communication, facilitate user ID synchronization across websites, and enable Pinterest to construct cross-site behavioral profiles for use in targeted advertising and audience segmentation. Accordingly, the Pinterest Tracker functions as a pen register and/or trap and trace device and/or process.

207. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Pinterest Tracker or to collect or share data with Pinterest.

208. Defendant's secret installation of the Pinterest Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**F. Rubicon Tracker**

209. The Rubicon Tracker is a programmatic advertising technology operated by Magnite, Inc., the parent company of the legacy Rubicon Project. It is designed to enable real-time bidding, identity matching through user ID synchronization mechanisms, and behavioral profiling through its integration into publisher websites. The Rubicon Tracker operates across a wide array of domains including rubiconproject.com, prebid-a.rubiconproject.com, and fastlane.rubiconproject.com, and supports header bidding auctions and audience segmentation across the open web.

210. When deployed on the Website, the Rubicon Tracker collects and transmits metadata such as page URLs, referrer headers, IP addresses, timestamps, and device-level information including screen resolution, operating system, and browser identifiers. The Rubicon Tracker facilitates cookie synchronization and executes real-time ad auctions, transmitting user metadata to advertisers who place bids on impressions based on behavioral and contextual signals. These operations drive persistent tracking of user activity across websites, devices, and sessions.

211. The Rubicon Tracker logs user interactions and interest signals from the Website, such as page navigation, product view events, and session duration. These data points are shared with Rubicon's ad exchange infrastructure and used to facilitate targeted advertising, optimize bid responses, and enhance user-level profiling for downstream ad targeting. The tracker operates automatically during the initial page load without any affirmative action by the user.

212. Figure 21 below is a screenshot from the Website, confirming that the Rubicon Tracker was triggered automatically during the user's session on the homepage. A GET request to pixel.rubiconproject.com, a domain operated by Magnite, Inc., returned a 200 OK status. This

request initiated Rubicon's tracking infrastructure, which supports behavioral profiling, audience segmentation, and programmatic ad auctions. The request confirms that the Rubicon Tracker was silently activated as part of the Website's background tracking operations.

***Figure 21***:




213. Figure 22 below shows a DNS query and corresponding response for the domain pixel.rubiconproject.com. This confirms that the Website initiated resolution of Rubicon's tracking domain during the user's session on the homepage. The DNS query was automatically triggered in the background without any user interaction, verifying that the Rubicon Tracker was silently activated and transmitting metadata to a third-party advertising server operated by Magnite, Inc.

//

//

//

//

//

***Figure 22***:




214. Defendant surreptitiously installed, executed, embedded, or injected the Rubicon Tracker onto users' browsers by incorporating Rubicon's tracking endpoints into the Website's source code or tag orchestration framework. When a user visits the Website, their browser processes these embedded tracking elements, initiating background requests that transmit metadata including IP address, referrer data, and interaction signals to Rubicon's servers as part of third-party advertising operations.

215. The Rubicon Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

216. The Rubicon Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See, e.g., James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

217. The Rubicon Tracker initiates a connection to its ad infrastructure upon page load via an embedded tracking pixel. It captures user metadata such as IP address, page path, timestamp, and unique identifiers all of which constitute routing or signaling information under CIPA.

218. The Rubicon Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures addressing and signaling metadata—including page URLs, device identifiers, timestamps, and referrer data—associated with electronic communications between the user and the Website. These signals are silently diverted to Rubicon's servers, enabling user tracking and advertising profile construction in real time.

219. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Rubicon Tracker on Plaintiff's and Class Members' browser or to collect or share data with Rubicon's servers.

220. Consequently, the Rubicon Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**G. The Taboola Tracker**

221. The Taboola Tracker is a third-party behavioral advertising and content-recommendation technology operated by Taboola, Inc. Taboola's tracking infrastructure is designed to collect page-view events, navigation data, and persistent identifiers from publisher websites in order to support cross-site audience profiling, advertising delivery, and content recommendation. Taboola's tracking endpoints operate through domains including trc.taboola.com and trc-events.taboola.com.

222. When deployed on the Website, the Taboola Tracker executed automatically during the initial page load and transmitted behavioral event data to Taboola-controlled servers within the first seconds of Plaintiff's visit. As shown in Figure 23 below, a network request to https://trc.taboola.com/ containing a page_view event was initiated almost immediately upon page load, confirming that Taboola received page-level behavioral metadata contemporaneously with Plaintiff's visit and prior to any user interaction or consent.

//

//

//

//

***Figure 23***:



223. In addition to transmitting page-view events, the Taboola Tracker placed a persistent identifier in Plaintiff's browser storage. As shown in Figure 24 below, Taboola created and stored a cookie labeled t_pt_gid, which functions as a unique, persistent identifier assigned to the browser. This identifier enables Taboola to recognize the same user across multiple page views, sessions, and websites participating in Taboola's advertising network. The cookie was created automatically and without any notice to or consent from Plaintiff.

***Figure 24***:



224. The Taboola Tracker also transmitted explicit user-level identifiers and device metadata in its event payloads. As shown in Figure 25 below, a captured request to https://trc-events.taboola.com/ included parameters such as uid, a unique user identifier assigned by Taboola; bndv, identifying the browser or device version; and event=page_view, explicitly designating the behavioral event being logged. This payload confirms that Taboola linked Plaintiff's page-view activity to a unique identifier and associated that activity with device-level metadata at the moment of initial page load.

***Figure 25***:



225. The sequence and timing of these events demonstrates that Taboola's tracking occurred immediately and automatically. Within approximately the first 0–3 seconds of Plaintiff's visit, the Website initiated DNS resolution for trc.taboola.com. Within approximately 0–4 seconds, Taboola received a page-view event payload containing a unique user identifier and browser metadata. Within approximately 0–5 seconds, the persistent t_pt_gid cookie was present in browser storage. At no point during this sequence was Plaintiff presented with a consent interface, notice, or opportunity to prevent these transmissions.

226. Through these mechanisms, Defendant caused Plaintiff's browser to initiate outbound network requests that transmitted routing, addressing, and signaling information to Taboola, including IP address, page URL, referrer context, timestamps, and persistent identifiers.

These transmissions occurred automatically as part of rendering the Website and diverted Plaintiff's communication metadata to a third-party advertising and profiling service without Plaintiff's knowledge or authorization.

227. Taboola, Inc. is a registered California data broker, as reflected in the California Data Broker Registry, which lists "Taboola, Inc." as a regulated data broker entity. This designation confirms that Taboola's role is not limited to incidental analytics, but includes the commercial collection, aggregation, and use of consumer data for advertising and data-driven services.

228. The Taboola Tracker is at least a "process" because it is software that identifies users, captures routing and signaling information associated with electronic communications, and correlates that data across page views and sessions. The Taboola Tracker is also at least a "device" because it operates by executing software on users' computing devices to initiate network communications and transmit metadata. *See, e.g., James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

229. The Taboola Tracker functions as a pen register and/or trap-and-trace device or process under the California Invasion of Privacy Act because it captures and transmits addressing and signaling information—including page URLs, timestamps, unique identifiers, and device metadata—associated with Plaintiff's electronic communications with the Website. These signals were silently routed to Taboola's servers in real time, enabling ongoing tracking and profiling of Plaintiff's browsing activity.

230. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' express or implied consent to install the Taboola Tracker, to place persistent identifiers in their browsers, or to transmit their routing, addressing, or signaling information to Taboola.

231. Accordingly, Defendant's deployment and use of the Taboola Tracker constitutes an unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of the California Invasion of Privacy Act, including California Penal Code § 638.51

## CLASS ALLEGATIONS

232. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period

233. **NUMEROSITY**: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

234. **COMMONALITY**: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

(a) Whether Defendant installed, executed, embedded or injected the Trackers on the Website;

(b) Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

(c) Whether Plaintiff and Class Members are subject to same tracking policies and practices;

(d) Whether Plaintiff and Class Members are entitled to statutory damages;

(e) Whether Class Members are entitled to injunctive relief;

(f) Whether Class Members are entitled to disgorgement of data unlawfully obtained; and

(g) Whether the Defendant's conduct violates CIPA.

235. **TYPICALITY**: As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims

that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

236. **ADEQUACY**: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

237. **SUPERIORITY**: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## FIRST CAUSE OF ACTION
### Violations of Cal. Penal Code § 638.51
### *By Plaintiff and the Class Members Against All Defendants*

238. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

239. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

240. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

241. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein;
5. Statutory damages under CIPA;
6. Prejudgment interest;
7. Reasonable attorney's fees and costs; and
8. All other relief that would be just and proper as a matter of law or equity.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated: January 9, 2026

**BURSOR & FISHER, P.A.**

By: *<u>/s/ L. Timothy Fisher</u>*
L. Timothy Fisher

L. Timothy Fisher (SBN 191626)
Daniel S. Guerra (SBN 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
dguerra@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Telephone: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
40729 Village Dr., Suite 8 – 1989
Big Bear Lake, CA 92315
Telephone: (562) 612-1708
Email: rc@rosscornellaw.com

*Attorneys for Plaintiff*